Merrimack
No. 2002-239

THE STATE OF NEW HAMPSHIRE

v.

DWAYNE THOMPSON

Argued: March 12, 2003
Opinion Issued: June 9, 2003

*Peter W. Heed*, attorney general (*Brian M. Quirk*, senior assistant attorney general, and *James D. Rosenberg*, assistant attorney general, on the brief, and *Mr. Quirk* and *Michael A. Delaney*, senior assistant attorney general, orally), for the State.

*Landya McCafferty*, assistant appellate defender, of Concord, on the brief, and *Ms. McCafferty* and *David M. Rothstein*, deputy chief appellate defender, of Concord, orally, for the defendant.

DALIANIS, J. The defendant, Dwayne Thompson, was convicted of first-degree murder. *See* RSA 630:1-a (1999). On appeal, he argues that the Superior Court (*McGuire*, J.) erred by: 1) ruling that polymerase chain reaction (PCR) based short tandem repeat (STR) DNA profiling is a generally accepted method of DNA testing; and 2) denying him a pretrial evidentiary hearing regarding the admissibility of PCR based amplitype PM+DQA1 DNA testing. We affirm.

On February 24, 2000, the body of the victim, Robert Provencher, was discovered in an apartment. The victim had been the defendant's roommate for approximately twenty years at the time of his death. The Concord Police Department and the State Police Major Crimes Unit searched the apartment, finding a black trash bag containing several pieces of bloodstained clothing and the victim's wallet, which was empty. In addition, the police discovered an Australian style safari hat that witnesses testified belonged to the defendant.

Both Cellmark Diagnostics (Cellmark) and the State Laboratory analyzed clothing found in the apartment. In performing DNA analysis, Cellmark used a system known as PCR-based STR testing and the State Laboratory used a system known as PCR-based amplitype PM+DQA1

testing. The defendant filed a motion requesting that the court conduct a pretrial evidentiary hearing on the reliability of the PCR-based PM+DQA1 DNA test under the standard set forth in *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993). The court denied the motion.

At trial, the State introduced the results of the DNA testing performed by Cellmark and the State Laboratory. Cellmark tested a long-sleeved work shirt and the hat found at the crime scene. It found that the bloodstain on the work shirt matched that of the victim, and that the defendant could not be excluded as the primary source of the DNA from the underarm of the shirt. To the extent traces of DNA from another individual were detected on the work shirt, Cellmark found those traces consistent with the victim's DNA. Cellmark also concluded that the DNA from the hat matched the defendant's DNA profile, and that any traces of DNA on the hat from a second individual were consistent with the victim's profile.

The State Laboratory tested both a bloodstain and the collar of a t-shirt found in the trash bag as well as a bloodstain and a cutting from the underarm of the work shirt found in the bag. The results of these tests established that the victim could not be excluded as the source of the DNA in the bloodstains, and that the defendant could not be excluded as the source of DNA on the t-shirt collar or the underarm of the work shirt. To the extent the State Laboratory discovered trace amounts of DNA from another individual on the collar of the t-shirt, it concluded that those traces were consistent with the victim's DNA profile.

I

The defendant first argues that the trial court erred in ruling that PCR-based STR DNA testing is a generally accepted method of forensic DNA testing. We recently held that PCR-based STR DNA testing is scientifically reliable under the standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *See State v. Whittey*, 149 N.H. 463 (2003). In this case, the defendant has incorporated by reference the record in *Whittey*, and has adopted the arguments made in that case as his own. Having addressed those arguments in *Whittey*, we need not consider them further here.

II

The defendant next argues that the trial court erred by denying him a pretrial evidentiary hearing regarding the admissibility of PCR-based amplitype PM+DQA1 DNA testing. Assuming without deciding that the trial court should have conducted such a hearing and, therefore, erroneously admitted the test results at trial, we find the error harmless.

It is well settled that the erroneous admission of evidence is harmless only if the State proves, beyond a reasonable doubt, that the verdict was not affected by the admission. *State v. Skidmore*, 138 N.H. 201, 203 (1993). "An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt." *State v. Pelkey*, 145 N.H. 133, 137 (2000) (quotation omitted).

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

*State v. Dupont*, 149 N.H. 70, 74 (2003) (quotation omitted).

The defendant testified at trial that the two shirts found in the trash bag and subjected to DNA testing belonged to him. Even without the defendant's admission, however, there is other evidence linking him to the clothing found in the trash bag. Other witnesses testified that the defendant wore an Australian-style safari hat identical to the one later found by the police at the crime scene. Further, Cellmark conducted DNA testing on both the long-sleeved work shirt and the Australian-style safari hat. Cellmark reached the same results as the State Laboratory when it tested the work shirt, but it also found that the primary source of DNA on the hat was the defendant.

In addition, the evidence other than the DNA evidence was so overwhelming that the verdict was not affected by the error. For example, one witness testified that the victim had been expressing frustration over the defendant's behavior, and that he intended to tell the defendant that he was "going to have to start getting everything together or he was going to have to find someplace else to live." Another witness testified that the victim and the defendant argued in a local coffee shop shortly before the murder. That same day the defendant purchased a hatchet at a sporting goods store. Doctor Thomas Gilson, the medical examiner who performed the autopsy on the victim, testified that many of the victim's injuries were consistent with having been caused by a weapon similar to the one that the defendant purchased. Doctor Steven Symes, a forensic anthropologist who examined the wounds on the victim's skull and tested the same brand of hatchet purchased by the defendant, confirmed Dr. Gilson's conclusions. He also testified that the hatchet that was used to kill the victim was either

new or had not been used previously, because the wounds had plastic in them.

The defendant, who was unemployed and in debt, purchased several items around the time of the murder, including computer ink jet cartridges, videotapes and jugs of wine, often paying with $100 bills. The victim was known to carry large bills and would sometimes pay for items with $100 bills. The police found many of the items and receipts from the defendant's purchases in the apartment when they discovered the victim's body, including two empty wine jugs and a partially viewed videotape. Moreover, the police found a trash bag in the apartment containing the defendant's bloodstained shirts and the victim's empty wallet.

Finally, the defendant traveled to California immediately following the murder and was apprehended there more than seven months later. While in California, the defendant changed his appearance by cutting his hair and shaving his mustache. He also assumed the identity of his twin brother and had in his possession various forms of identification in his brother's name, including a non-driver identification, a birth certificate, a social security card and a food stamp card.

█ We conclude that the alternative evidence of the defendant's guilt is so overwhelming that it renders the results of the State Laboratory's amplitype PM+DQA1 DNA test evidence cumulative and inconsequential. Thus, we hold that the State has satisfied its burden of proving, beyond a reasonable doubt, that the admission of the amplitype PM+DQA1 DNA test evidence did not affect the verdict. As a result, the trial court's admission of this evidence, even if erroneous, was harmless.

*Affirmed.*

BROCK, C.J., and NADEAU, J., concurred.