Rockingham
No. 2005-507

# The State of New Hampshire

v.

# Rose Marie Wall

Argued: July 20, 2006
Opinion Issued: October 13, 2006

*Kelly A. Ayotte,* attorney general (*Susan P. McGinnis,* assistant attorney general, on the brief and orally), for the State.

*Brennan, Caron, Lenehan & Iacopino,* of Manchester (*Michael J. Iacopino* and *Jaye L. Rancourt* on the brief, and *Ms. Rancourt* orally), for the defendant.

GALWAY, J. The defendant, Rose Marie Wall, appeals rulings of the Superior Court (*Coffey,* J.) denying her pretrial motions to suppress the results of blood tests conducted while she was a patient at Parkland Medical Center. We affirm.

The record supports the following. In March 2003, the defendant was involved in an automobile accident in which the vehicle that she drove collided with the rear of another vehicle. Police officers arrived at the scene and spoke to fire and rescue personnel, who told them that emergency medical personnel were attending to the defendant and a child who had been a passenger in the defendant's vehicle. The officers were informed that fire and rescue personnel had smelled the odor of alcohol emanating from the defendant. The officers instructed an ambulance driver to take her to a New Hampshire hospital. She was then transported to Parkland Medical Center in Derry.

At the hospital, the officers attempted to speak with her in the emergency room. Although she refused to answer the officers' questions,

they were able to observe that her eyes were glassy and bloodshot and that she smelled of alcohol. The officers arrested her for driving while intoxicated. While at the hospital, the officers did not ask hospital staff to draw or test the defendant's blood.

On the following day, a police officer returned to the hospital and requested any blood samples and blood test results taken from the defendant by hospital staff. Although the officer did not have a warrant, hospital staff gave him a report of the defendant's blood test results as well as two blood samples. The report stated that the defendant had a blood alcohol content of 0.256. The samples were taken to the State Laboratory for testing. The State Laboratory's testing showed a blood alcohol content of 0.23. The defendant was subsequently indicted for aggravated driving while intoxicated under RSA 265:82-a, III (Supp. 2003), which requires a blood alcohol concentration of 0.16 or more, reckless conduct under RSA 631:3, II (1996), and endangering the welfare of a child under RSA 639:3, I (1996).

Prior to trial, the defendant moved to suppress the results of the blood tests conducted both at the hospital and the State Laboratory. The defendant argued that the hospital acted as an agent of the police in drawing her blood, and thus needed a warrant to do so. The defendant also argued that the police's seizure of the blood samples and test results from the hospital violated the State and Federal Constitutions. In addition, the defendant moved to exclude any evidence regarding the blood tests performed at the hospital and the State Laboratory, arguing that the hospital did not follow a proper chain of custody while in possession of the samples. The trial court denied the defendant's motions.

At trial, the State introduced the hospital's test results as a business record. The defendant objected, based upon a lack of a chain of custody, and the court overruled the objection. The defendant also unsuccessfully objected when the State introduced the test results from the State Laboratory. The defendant was found guilty of the charges stated above.

On appeal, the defendant argues: (1) that hospital staff acted as agents of the police in drawing her blood without a warrant or exigent circumstances, thus violating Part I, Article 19 of the State Constitution and the Fourth and Fourteenth Amendments to the Federal Constitution; (2) that there was an insufficient chain of custody established from the time the hospital drew the defendant's blood to its arrival at the hospital's laboratory for testing; and (3) that the police violated the State and Federal Constitutions by seizing the defendant's blood samples and blood test results from the hospital without a warrant and without the defendant's consent.

*I. Agency Relationship*

The defendant argues that the hospital acted as an agent of the State when hospital staff drew the defendant's blood. The agency relationship was created, the defendant argues, at the accident scene, when the police directed the ambulance driver to take the defendant to a New Hampshire hospital. The defendant points to testimony that the officer's purpose in directing the defendant to a New Hampshire hospital was so that he could obtain a blood sample. Had the police not so instructed the driver, the defendant asserts, the ambulance personnel would have transported the defendant to a Massachusetts hospital, which is where they transported the injured passenger. The defendant concludes that the agency relationship established at the accident scene with the ambulance personnel extended to the hospital staff who drew her blood.

■ The constitutional protections against unreasonable searches and seizures apply only to State action. *State v. Nemser*, 148 N.H. 453, 454 (2002). Evidence obtained by a private party is generally free of constitutional restraints; however, constitutional restrictions apply to a search or seizure of evidence by a private party acting as an agent of law enforcement. *Id.* at 454-55. This principle, known as the "agency rule," prevents police from having private individuals conduct searches or seizures that would be unlawful if performed by the police. *Id.* at 455.

■ "A finding of agency relies upon the unique position of the fact-finder, who assesses first-hand all of the verbal and nonverbal aspects of the evidence presented." *State v. Heirtzler*, 147 N.H. 344, 350 (2002). The totality of the circumstances must be considered when determining whether the operative facts create an agency relationship. *Id.* at 349-50. Because the determination of whether an agency relationship exists is fact-driven, we employ a deferential standard in reviewing the trial court's finding. *Nemser*, 148 N.H. at 455. We will "uphold a trial court's finding of an agency relationship unless it is unsupported by the record or clearly erroneous." *Id.* (quotation omitted).

■ A conclusion that an agency relationship existed between the government and a private individual requires proof of an affirmative act by a state official prior to the search or seizure that can reasonably be seen to have induced the search or seizure by the private party. *Id.* Two kinds of governmental action will meet this standard. *Id.*

> The first is the government's prior agreement with a third party that the latter should act to obtain evidence from a defendant. Whether the agreement is formal or informal, there will be some

responsive communication between the parties, and the exchange will evince an understanding that the third party will be acting on the government's behalf or for the government's benefit.

*Id.* (citation and quotations omitted). Second, a prior governmental request for help may establish that the private individual acted on the government's behalf again, even if the actor makes no reply to the government but responds simply by taking the action requested by the state official. *Id.*

■ In the instant case, the defendant argues that the first kind of governmental action took place, and that the trial court erroneously found no agency relationship. We disagree. Although the police affirmatively requested that the ambulance driver bring the defendant to a New Hampshire hospital, the trial court found no evidence that the ambulance personnel notified hospital staff of the officer's request. Thus, the trial court found, any agency relationship created between the officer and the ambulance personnel did not extend to hospital staff, and it was the hospital staff, not the ambulance personnel, who drew the defendant's blood. Further, the trial court found no evidence that the police asked anyone to draw a blood sample from the defendant. Thus, any agency relationship that may have arisen included only transportation, not the drawing of blood. Based upon the totality of the circumstances, the trial court found that the blood drawn by hospital staff occurred for medical treatment, not because of an agency relationship with law enforcement. We cannot conclude that the trial court's findings are unsupported by the evidence or clearly erroneous. Accordingly, we uphold the trial court's finding that the police did not establish an agency relationship with the hospital staff members who drew the defendant's blood.

*II. Chain of Custody*

The defendant next argues that because there was an insufficient chain of custody linking the blood drawn from the defendant to the blood tested at the hospital's laboratory and the blood tested at the State Laboratory, all test results should have been excluded from evidence. The break in the chain of custody occurred, the defendant argues, because the hospital could not establish which staff member drew the blood, the method by which the blood was drawn, who labeled the samples, and who transmitted the samples to the hospital laboratory. The trial court admitted the hospital's report as a business record. For reasons discussed below, we need only address the admission of the hospital's laboratory results.

■ In challenging the chain of custody, the defendant appears to implicate New Hampshire Rule of Evidence 901, which governs the

authentication and identification of evidence. The defendant's challenge is not to the authenticity or identity of evidence introduced at trial, however. No blood sample was introduced as evidence. The evidence at issue is the hospital's laboratory test report. The defendant does not argue that the report introduced at trial was not the authentic report generated by the hospital laboratory. The defendant instead challenges the report's veracity. This challenge appropriately falls not under New Hampshire Rule of Evidence 901, but under New Hampshire Rule of Evidence 803(6). Rule 803 provides:

> The statements, records and documents specified in 803(1) through 803(24) are not excluded by the hearsay rule, even though the declarant is available as a witness.
>
> . . . .
>
> (6) *Records of Regularly Conducted Activity*
>
> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, . . . unless the source of information or the method of circumstances of preparation indicate a lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Rule 803(6) requires that the proponent of the document produce the custodian of the record, or another qualified witness, to testify about the identity and mode of preparation of the proffered document, and to testify that it was made in the regular course of business at or near the time of the transaction recorded. *Powell v. Catholic Med. Ctr.*, 145 N.H. 7, 17 (2000). "Verification of the authenticity, regularity and correctness of such records by 'the official having them in charge,' or by another qualified witness, constitutes the proper foundation for admission of the proffered record." *Wallace v. Lakes Region Construction Company*, 124 N.H. 712, 716 (1984) (citation omitted). Generally, we accord considerable deference to a trial court's evidentiary rulings and will only intervene when they demonstrate an unsustainable exercise of discretion. *State v. Belton*, 150 N.H. 741, 743 (2004). Unless a party establishes that such a ruling was

clearly untenable or unreasonable to the prejudice of the party's case, we will not disturb it. *Id.*

At trial, the State introduced the hospital's blood test report while examining Karen Marie Ryen, director of health information management at the hospital. Ryen was responsible for maintenance of hospital medical records and testified that her usual duties included keeping records of patient tests and diagnoses. Ryen testified that the report of the defendant's blood test was generated by the hospital's laboratory and that she regularly receives such reports. Ryen also described the hospital's automated system of record printing that creates duplicate copies of laboratory reports so that the hospital's record keepers may store permanent copies of patients' medical records. Ryen identified the defendant's laboratory report, based upon information on the report, including the defendant's name and medical record number, which is a number that the hospital permanently assigns to a patient.

The State also presented testimony from Katherine Ayres, the director of laboratory services at the hospital. She described the staff positions authorized to draw blood, the procedure for drawing blood, the procedure for labeling blood samples with identifying information, and the procedure for taking blood samples to the hospital laboratory. She testified that the person drawing the blood from a patient labels the blood sample with identifying information, including the patient's name, date of birth, and medical record number, the date of testing, and the tests required. The staff member double-checks the patient's identifying information by both asking the patient for the information and by reading the patient's arm band. The patient's information is recorded in the hospital's computer system, so that the laboratory can access the information, and a bar code stating the information is affixed to the tube containing the blood sample. All hospital staff members charged with drawing blood undergo annual training in blood draw procedures. Ayres further testified that the hospital laboratory will not accept blood samples for testing if the samples do not have the proper labeling information. Once the sample enters the laboratory, a laboratory technician places the sample in an analyzer, which is a machine with an automated testing procedure. The analyzer reads the bar code on the tube, tests the blood, and generates a report with the test results. This report includes all identifying information from the bar code, including the patient's name and date of birth. The particular analyzer that the hospital used to test blood for alcohol content at the time of the defendant's admission to the hospital was subject to quality control checks every day and proficiency testing three or four times a year.

■ The State thus produced ample testimony from the custodian of records at the hospital, Ryen, who identified the hospital's laboratory report, testified to the mode of preparation of the report, and testified that it was made in the regular course of business. Ayers' testimony provided further detail regarding the report's preparation and the timing of the document's creation.

The defendant's argument regarding chain of custody does not compel a finding that the report lacked trustworthiness under Rule 803(6). Evidence need not be infallible to be admissible. *State v. Dahood*, 148 N.H. 723, 727 (2002). If the evidence is of aid to the judge or jury, its deficiencies or weaknesses are a matter of defense, which affect the weight of the evidence but do not determine its admissibility. *Id.* The federal courts, which employ a business records exception that is identical to ours, FED. R. EVID. 803(6), have addressed the issue of accuracy in this context: "[A] party need not prove that business records are accurate before they are admitted. Generally, objections that an exhibit may contain inaccuracies, ambiguities, or omissions go to the weight and not the admissibility of the evidence." *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999) (quotations omitted); *see also United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1991). The "qualified witness" required by Rule 803(6) need only be someone who understands the system of how the document was made, and need not have participated in the document's creation or know who created it. *United States v. Keplinger*, 776 F.2d 678, 693-94 (7th Cir. 1985).

Accordingly, we conclude that the trial court did not commit an unsustainable exercise of discretion by admitting the hospital's laboratory report.

### III. Seizure of Blood Samples and Test Results from the Hospital

The defendant argues that she had an expectation of privacy in her blood test results and blood samples taken by the hospital. The police violated her constitutional rights, she argues, by seizing the test results and samples without a warrant and without her consent. The State responds that her expectation of privacy in her blood test results and blood samples was not reasonable. In the alternative, the State argues that, even if the police improperly seized the blood and test results, any error in admitting evidence obtained by the seizure was harmless because the State properly introduced evidence of the defendant's blood alcohol content as a business record from the hospital.

■ Because we decide cases upon constitutional grounds only when necessary, *Simplex Technologies v. Town of Newington*, 145 N.H. 727, 732 (2001), we begin by addressing the State's claim of harmless error and

assuming without deciding that the State's seizure of the defendant's blood samples and test results violated the defendant's constitutional rights. The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence. *State v. Thompson*, 149 N.H. 565, 567 (2003). The harmless error doctrine promotes public respect for the criminal process by focusing upon the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error. *Id.* It is well settled that the erroneous admission of evidence may be harmless if the State proves, beyond a reasonable doubt, that the verdict was not affected by the admission. *Id.* "An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt." *Id.* Accordingly, it is the State's burden to prove beyond a reasonable doubt that the introduction of evidence that was the fruit of the police's seizure did not affect the verdict.

The State argues that the introduction of evidence seized by the police did not affect the verdict because the defendant's blood alcohol content was properly admitted through the hospital's laboratory report. As explained above, the trial court properly admitted the hospital's laboratory report. That report stated that the defendant's blood alcohol level when she was in the hospital was 0.256. The State Laboratory's test, which we will assume was erroneously admitted, showed a blood alcohol content of 0.23. Both results were substantially above the blood alcohol concentration of 0.16 necessary for a conviction for aggravated driving while intoxicated under RSA 265:82-a, II. Additional evidence of the defendant's intoxication included testimony from a police officer who, while at the hospital, smelled the odor of an alcoholic beverage emanating from the area of the defendant's head and noticed that her eyes were bloodshot and glassy, and from a fire chief who smelled the odor of an alcoholic beverage on the defendant when he attempted to communicate with her while she was still in her vehicle. We conclude that the properly admitted evidence of the defendant's intoxication was of overwhelming weight, and the State Laboratory's evidence was merely cumulative. The State has thus met its burden to prove beyond a reasonable doubt that the introduction of evidence that was the fruit of the police's seizure did not affect the verdict and any error that the trial court made in admitting such evidence was harmless.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.